Ryan G. Baker (Bar No. 214036)
  rbaker@waymakerlaw.com
Jaime W. Marquart (Bar No. 200344)
  jmarquart@waymakerlaw.com
Teresa L. Huggins (Bar No. 263257)
  thuggins@waymakerlaw.com
Sam S. Meehan (Bar No. 307934)
  smeehan@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

*Attorneys for Plaintiff Tony Bobulinski*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Tony Bobulinski, an individual, | Case No.  2:24-cv-2600 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1. **FRAUD;** |
| Hugh Dickson, an individual; Hickory Grove, LLC, a limited liability company, Jake Fisch, an individual; Don Williams, an individual; Grant Thornton Specialist Services Ltd., a corporation; Robert Roche, an individual; Theresa Roche, an individual; Phillip Tyrrell, an individual; Sheppard Mullin Richter & Hampton LLP, a limited liability partnership; Walkers LLP, a limited liability partnership; MGG Investment Group, LP, a limited partnership, and DOES 1 through 50, | 2. **CONSPIRACY TO COMMIT FRAUD;** 3. **COMMON LAW FRAUDULENT TRANSFER;** 4. **AIDING AND ABETTING COMMON LAW FRAUDULENT TRANSFER;** 5. **VIOLATIONS OF CAL. CIV. CODE § 3439; AND** 6. **AIDING AND ABETTING VIOLATIONS OF CAL. CIV. CODE § 3439** |
| Defendants. | DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.     This action arises through a coordinated series of material misrepresentations, culminating in a secret, fraudulent transaction that allowed Defendants to avoid making Tony Bobulinski whole on a debt that they all knew he was owed.  Bobulinski – an expert in investing in distressed businesses – provided critical bridge funding to a now-defunct Cayman Islands company called China Branding Group ("CBG"), quickly introduced CBG to an investment bank that specialized in finding buyers for distressed companies, and then himself introduced CBG to a potential buyer.  Within a matter of months, Bobulinski provided critical funding to improve and maintain CBG's solvency and guided it to a $23.5 million acquisition offer, which paled in comparison to the $1.875 million (including certain other agreed upon compensation like a fee for finding the buyer) that Bobulinski was owed at the time.  This offer reflected the significant value of the collateral owned by CBG – collateral that was pledged to Bobulinski to secure his investment in the company and was more than enough to provide Bobulinski and all other secured creditors of CBG a full return on their investments.

2.     As soon as the ink was dry on the formal letter of intent, however, Defendants began, through fraud and deceit, to rob Bobulinski of the amounts he was owed, setting off a fraudulently-premised, international saga that cost Bobulinski tens of millions of dollars in consequential damages and lost profits.  In the end, essentially everyone – including many of the Defendants – received a greater return on their investment than Bobulinski, the single person who brought the parties together for the transaction to begin with and the only secured creditor at the time of the sale.

3.     Making matters worse, Defendants (acting through CBG's Joint Official Liquidators ("JOLs") appointed by the Cayman Islands court) have doubled and tripled down on their fraudulent conspiracy spanning two countries, hiding the true facts of their fraudulent transaction for years while they sought and received cost orders against Bobulinski in the Cayman Islands – some of which were falsely

obtained — and then sought to collect on those falsely obtained orders in the United States. Once Bobulinski uncovered the facts relating to Defendants' fraudulent conspiracy, a Cayman Islands appeals court put a fast end to their scheme, finding in March 2023 that the lower court's decision rejecting Bobulinski's Proof of Debt in the Cayman Islands had been decided against him on a "fundamentally false basis." But that hardly began to make Bobulinski whole.  This action seeks to make him whole and to finally place accountability on the shoulders of all of the bad actors responsible for this unnecessary mess.

4.     It all began with Plaintiff Tony Bobulinski investing $650,000 in CBG. Pursuant to the terms of Bobulinski's Senior Secured Promissory Note (the "Note") and a corresponding Pledge Agreement (the "Pledge Agreement"), which memorialized the security interest, Bobulinski's Note was secured by assets purportedly owned by CBG, including CBG's "content library, license agreements, and physical assets, such as production equipment" in the United States (collectively, the "Collateral"). Other investors in CBG signed similar Notes and Pledge Agreements. All Notes and Pledge Agreements, including Bobulinski's, were authored by CBG's transactional counsel, Don Williams and his law firm, Sheppard, Mullin, Richter & Hampton, LLC ("Sheppard Mullin").

5.     CBG's CEO, Adam Roseman ("Roseman"), initially told Bobulinski that his Note would be senior secured by the Collateral, which meant that Bobulinski's loan was to be "paid off in first priority."  Roseman assured Bobulinski that if CBG failed, Bobulinski would be protected because his Note would be senior in order of funding. At all relevant times, all Defendants were aware of Bobulinski's senior secured status. Despite this awareness, Defendants knowingly and maliciously ignored his rights to make off with more money themselves.

6.     Bobulinski would not have entered into the Senior Secured Promissory Note or the Pledge Agreement without assurances – expressed in the Pledge Agreement itself and by Roseman, on behalf of CBG – that the Note was senior

secured by the Collateral (which, as noted further below, it was at the time of the fraudulent Asset Transfers). Roseman has since essentially admitted to all of these facts in a sworn affidavit.

7. The mechanics of the fraud started shortly after Bobulinski entered into the Note. Despite the fact that there were no payment obligations due under any Note, including Bobulinski's, and that CBG recently received the $23.5 million offer from Remark Media, Inc. ("Remark"), on or about April 24, 2016, Jacob Fisch ("Fisch"), on behalf of CBG (claiming to have done so at the direction of CBG's board of directors), sent written notice to CBG's Noteholders stating CBG was unable to meet its Noteholder payment obligations. Fisch worked for and at the behest of CBG director Robert Roche ("Roche"), who controlled CBG's largest creditor, Hickory Grove, LLC ("Hickory Grove"). Prior to sending out the written notice, neither Roseman, Roche, Fisch, nor anyone else from CBG had asked Bobulinski for funds that would enable CBG to meet its payment obligations. Pursuant to the terms of all Notes, including Bobulinski's, "written notice" that CBG could not meet its obligations under outstanding Notes was an event of default (the "Event of Default"), opening the door for creditors to initiate wind-up proceedings.

8. Accordingly, on April 28, 2016, four days after the Event of Default was sent, Hickory Grove, at Roche's direction, presented a creditor's winding up petition against CBG in the Cayman Islands. The petition was submitted to the Grand Court of the Cayman Islands (the "Cayman Court"), as CBG is a company incorporated in the Cayman Islands. CBG was forced into provisional liquidation a month later.

9. In July 2016, CBG's Joint Provisional Liquidators sought approval from the Cayman Court for the sale to Remark. On August 18, 2016, CBG was placed into official liquidation and Hugh Dickson and David Bennett were appointed as the Joint Official Liquidators pursuant to an August 18, 2016 winding

up order issued by the Cayman Court.  The sale to Remark was sanctioned by the Cayman Court that same day.  The JOLs never obtained sanction to transfer assets from CBG to RAAD Productions, LLC ("RAAD"), however.  Nor did they disclose to the Cayman Court that such a transaction was anticipated.

10.     Through deposition testimony in litigation related to CBG taken in April of 2021, Bobulinski learned for the first time that CBG and its JOLs worked in concert on the eve of the sale to Remark to secretly move assets which qualified as Collateral under Bobulinski's Pledge Agreement (thus securing Bobulinski's loan to CBG) to other companies, including RAAD, a company incorporated under the laws of California. Specifically, on September 19, 2016, the three largest shareholders of RAAD, including Hickory Grove, entered into an agreement with CBG in which RAAD became a wholly owned subsidiary of CBG the day before the sale to Remark.  The next day, the shares in RAAD were sold to CBG for the measly sum of $10 and Hugh Dickson of the JOLs, on behalf of RAAD, entered into a series of secret assignment agreements with CBG in which CBG transferred key assets to RAAD.  Thereafter, on September 20, 2016, CBG, now cleared of key assets, entered into the Asset and Securities Purchase Agreement ("APA"), an agreement to sell three of its subsidiaries (which now included RAAD) to Remark.  Hereinafter, this process of clearing key assets out of CBG before the sale to Remark will be referred to as the "Asset Transfers."

11.     This fraud was spearheaded by Defendant Roche, among others, who had grown frustrated by Bobulinski's refusal to sign a distribution agreement that all other Noteholders but Bobulinski had signed, which would have allowed CBG to transfer the assets that secured his loan.  Roche grew tired of negotiating with the holdout Bobulinski and instead cooked up a fraudulent "work around" scheme to push the deal with Remark through in spite of Bobulinski's rights.  Roche worked on the granular details of the deal documents with CBG's counsel, including Don Williams of Sheppard Mullin.

12.     Williams' and Sheppard Mullin's role throughout this process was critically important.  Williams was counsel for CBG before, during and after the liquidation.  Williams was the primary lawyer who advised CBG in its efforts to obtain secured financing. He authored the Notes and Pledge Agreements that effectuated that financing, providing CBG and its CEO with counsel on those documents and the protections they provided to CBG's creditors. As such, Williams had intimate and firsthand knowledge of CBG's assets; its corporate structure, including its subsidiaries; and the nature of the Collateral that secured the Notes, including Bobulinski's. Williams knew CBG owned the Dick Clark Production Licenses ("DCP Licenses") that were included in the Collateral and knew Bobulinski's Pledge Agreement, which he drafted, did not allow CBG to transfer the licenses without Bobulinski's consent.  Once CBG went into liquidation, Williams was on CBG's liquidation committee and continued to advise CBG on its rights and the rights of its creditors, serving as CBG's counsel throughout the liquidation and the eventual sale of its assets to Remark.  Williams and Sheppard Mullin were also counsel to RAAD. During the sale, Williams, as Seller's counsel, advised CBG and RAAD on the closing documents necessary to effectuate the sale to Remark. He reviewed and approved all closing documents on behalf of CBG and RAAD, and, critically, assisted with the drafting and negotiation of the assignment agreements, transferring key CBG assets to RAAD prior to the sale to Remark.  On September 19, 2016, the day before the APA was executed, Williams represented to Remark that RAAD was free and clear of any "liens, claims or encumbrances."  Of course, Williams neglected to make any mention of Bobulinski's rights under the Note and Pledge Agreement to the CBG assets that had been transferred to RAAD through the fraudulent Asset Transfers that Williams himself helped orchestrate.

13.     At all relevant times, Roche and Williams knew Bobulinski was CBG's senior secured creditor.  They ignored Bobulinski's rights and lied to Bobulinski to enrich themselves and their fellow Defendants.

14.     Based on his belief that he was a senior secured creditor of CBG, whose loan was secured by the Collateral, Bobulinski submitted a Proof of Debt to the JOLs during CBG's liquidation proceedings in the Cayman Islands (the "Cayman Liquidation") for a total of $1,625,000, which included the principal Note amount plus a 2.5x multiplier, as required by the Note and which CBG had promised Bobulinski would receive.

15.     Ultimately, the JOLs fraudulently rejected Bobulinski's Proof of Debt, claiming that Bobulinski was only owed a balance of the principal $650,000, and that he was not senior secured because CBG did not own the Collateral at the time of the sale.  Bobulinski expressed his shock at the JOLs' rejection of his Proof of Debt to CBG's CEO Roseman and CBG's counsel, Don Williams, urging them in emails to do the right thing and inform the JOLs' of his rights under the Note and Pledge Agreement that Williams had drafted, CBG approved and Roseman executed on CBG's behalf.  Williams, on behalf of CBG, refused.  Though he was aware of Bobulinski's rights as the senior most secured creditor of CBG, Williams worked in concert with the other Defendants to actively conceal key assets that secured Bobulinski's loans to CBG.

16.     Bobulinski was instead forced to pursue his rights in a separate legal proceeding in the Grand Court of the Cayman Islands entitled *In the Matter of China Branding Group Limited (In Official Liquidation)*, Cause No. FSD 52 of 2016 (RMJ) (the "Cayman Litigation").  The Cayman Litigation took nearly two and a half years.  Bobulinski litigated under the belief that he was a senior secured creditor with a security interest in the Collateral.  During this time, these difficult legal proceedings consumed Bobulinski's life.  The Cayman Court accepted the JOLs' argument that CBG did not own the Collateral at the time of the sale to Remark and that those assets were actually owned by RAAD.  Therefore, the Cayman Court found that Bobulinski did not have a security interest in the Collateral and was not a secured creditor in CBG.  Bobulinski was denied discovery throughout the litigation

over his Proof of Debt in the Cayman Islands. Only in discovery in subsequent litigation in the United States did Bobulinski learn for the first time that he had been defrauded by a coordinated bait-and-switch.

17.     Once Bobulinski pieced together the jigsaw puzzle of the fraud committed against him, he returned again to court in the Cayman Islands in 2021 to undo the 2019 ruling that Bobulinski was not a secured creditor of CBG.  The Cayman Islands Court of Appeal issued a ruling (the "Cayman Appeal Ruling," attached hereto as Exhibit A) in March 2023, finding that the lower court's decision rejecting his Proof of Debt had been decided against him on a "fundamentally false basis." Specifically, the Cayman Court of Appeal ruled that the JOLs had failed to disclose the Asset Transfers during the sale to Remark. In other words, before any litigation commenced or was even anticipated, Defendants orchestrated a scheme to deprive Bobulinski of his senior secured status.

18.     Bobulinski incurred significant damages as a result of Defendants' fraudulent transaction and the myriad lies and omissions attendant thereto. Bobulinski has recovered nothing on his initial $650,000 loan.  Moreover, the Note explicitly provided that Bobulinski was owed the principal amount of his loan plus a 2.5x return, for a total of $1,625,000, which should have been paid on or before the sale of CBG to Remark.  Instead of receiving any of the promised payout, Bobulinski was forced to spend hundreds of thousands of dollars and years of his life litigating in the Cayman Islands in a vain attempt to obtain the benefits he had been promised.  To rub salt in the wound, the JOLs came after Bobulinski on his home turf, filing suit against him in the United States for recognition and enforcement of a Cayman judgment awarding the JOLs the fees they incurred in the Cayman Litigation over Bobulinski's Proof of Debt, which a Cayman appeals court has now found were obtained on "on a fundamentally false basis."  Litigating these issues was not only taxing on Bobulinski's wallet, he also suffered significant emotional distress.  Unable to recover anything from his loan, Bobulinski was

unable to use the significant capital he thought he had temporarily loaned CBG for investment in another opportunity.

19.     Bobulinski now seeks compensation for the damages he has incurred as a result of Defendants' misrepresentations.  This is well in excess of the original amount due on the Note and Pledge Agreement, and includes millions of dollars in consequential damages for legal fees and experts unnecessarily spent, as well as tens of millions of dollars in lost profits.

## THE PARTIES

20.     Plaintiff Tony Bobulinski is a resident of the United States. He ceased being a resident of California in 2022, and is not a resident of any of the states where any of the Defendants reside.

21.     Defendant Robert Roche is an individual residing, upon information and belief, in Illinois.

22.     Defendant Hickory Grove, LLC is an entity organized, upon information and belief, in Nevada.

23.     Defendant Theresa Roche is an individual residing, upon information and belief, in Palos Hills, Illinois.

24.     Defendant Jake Fisch is an individual residing, upon information and belief, in Shanghai, China.

25.     Defendant Sheppard Mullin Richter & Hampton LLP is a law firm headquartered in Los Angeles, California.

26.     Defendant Don Williams is an individual residing, upon information and belief, in Shanghai, China

27.     Defendant Grant Thornton Specialist Services Ltd is an insolvency and corporate restructuring services firm organized, upon information and belief, in the Cayman Islands.

28.     Defendant Hugh Dickson is an individual residing, upon information and belief, in the Cayman Islands.

29.     Defendant Phillip Tyrrell is an individual residing, upon information and belief, in the Cayman Islands.

30.     Defendant Walkers LLP is a law firm organized, upon information and belief, under the laws of the Cayman Islands.

31.     Defendant MGG Investment Group, LP is an investment banking firm incorporated in the State of Delaware and headquartered in New York, New York.

32.     Plaintiff is unaware of the true names and capacities, whether individuals, corporations, or law firms, or otherwise, of certain Defendants, including those who acted outside the scope of their professional representation of other named Defendants.  Therefore, Plaintiff sues these Defendants as DOES 1 through 50, inclusive, or any of them, by such fictitious names.  Plaintiff will seek leave of this Court to amend this Complaint, if necessary, when the status and identities of these Defendants are ascertained.  At all relevant times, these DOE Defendants were each a co-conspirator of and with each of the other Defendants.  In committing the acts and failing to act as set forth herein, each DOE Defendant acted with the knowledge, permission, and the consent of each of the other Defendants.  Each Defendant aided and abetted the other Defendants in the acts or omissions alleged in this Complaint.

33.     Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, each and every Defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each other defendant and, that in performing or failing to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other Defendants.  Plaintiff is further informed and believes that each Defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same

1  time, for their own financial and individual advantage, as well as in the course and

2  scope of such employment, agency and as an alter ego therein.

3      34.    At all times material to this action, each Defendant was a co-

4  conspirator of and with each of the other Defendants, and the acts of each defendant

5  was in the scope of the relationship.  In committing the acts and failing to act as set

6  forth herein, each Defendant acted with the knowledge, permission, and the consent

7  of each of the other Defendants.  Each Defendant aided and abetted the other

8  Defendants in the acts or omissions alleged in this Complaint.

9                      **JURISDICTION AND VENUE**

10     35.    This Court has federal diversity jurisdiction over Plaintiff's claims

11  under 28 U.S.C. § 1332(a).

12     36.    The diversity requirement of section 1332(a) is satisfied in this action

13  because the matter in controversy is "between citizens of different States." 28

14  U.S.C. § 1332(a)(1).  The amount-in-controversy requirement of section 1332 is

15  satisfied because Plaintiff is seeking to recover a sum that "exceeds the sum or value

16  of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1).  Venue is

17  proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or

18  omissions giving rise to the claims set forth herein occurred in this judicial district.

19     37.    The Court has personal jurisdiction over all Defendants, who have all

20  engaged in business activities in, and directed to, the State of California and have

21  committed tortious acts within the state.  Defendants have purposefully availed

22  themselves of the opportunity to conduct commercial activities in this forum, and

23  this Complaint arises directly out of those activities.

24        **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

25         **Bobulinksi Invests in CBG to Save the Ailing Business**

26     38.    CBG was a Cayman Islands corporation, whose primary business was

27  to provide live event and media content into the Chinese marketplace.  In or around

28  2015, CBG sought working capital to fund its growth.

39.     On or about March 5, 2015, Adam Roseman, founder and CEO of CBG, emailed his long-time friend and business associate, Tony Bobulinski, seeking a short-term bridge loan for CBG. Roseman wrote that the loan was to be "a senior secured loan to be paid off in first priority" and "secured by all our assets (content licenses, our production library and our fixed production equipment in our 10k square foot studio in Culver City) and all bridge loan principal and interest secured in first position."  Bobulinski expressed interest in helping Roseman, and communications took place. During these conversations, Roseman told Bobulinski that CBG owned the rights and interests in certain assets, including a content library, license agreements, and physical assets (including production equipment).

40.     Roseman at all times acted consistently with his statements that the Collateral was owned by CBG. For example, Roseman offered to take Bobulinski to "come see the Culver studio" in a March 20, 2015 email, referencing CBG's offices in Culver City, California.  Roseman repeated these same statements during a March 25, 2015 in-person meeting in Beverly Hills, California, when he went into further detail explaining CBG's purported assets to Bobulinski.  Wanting to move quickly, Roseman informed Bobulinski that he would take a loan on any terms Bobulinski needed. Believing that CBG owned the Collateral, Bobulinski required that his loan be senior secured by all of CBG's assets. Roseman also promised Bobulinski that, if CBG were sold, he would receive a 2.5 multiplier of his principal loan.

41.     Roseman, on behalf of CBG, agreed to these terms, assuring Bobulinski that: any loan he provided would be senior secured by all of CBG's assets; if CBG were sold, his loan would be senior in order of funding; and Bobulinski would be entitled to a 2.5 multiplier of his principal loan amount. Roseman assured Bobulinski that their understanding would be properly documented by the law firm Sheppard Mullin, counsel for CBG.  Bobulinski trusted Roseman, based on their long-standing friendship and business association. On Roseman's advice, Bobulinski did not retain separate counsel.

**Bobulinski Enters into the Note and Pledge Agreement with CBG**

42.     On or about April 15, 2015, Bobulinski entered into the Secured Convertible Promissory Note and Pledge Agreement, providing CBG with a $500,000 loan in reliance on CBG's assurances that his Note was secured by the Collateral, that he would receive a 2.5 multiplier of his principal, and that he had the right to approve any sale of CBG.  Bobulinski's Note and Pledge Agreement were drafted by Don Williams of Sheppard Mullin, fully approved by CBG's Board and countersigned by Roseman, on behalf of CBG.  As the author of the Note and Pledge Agreement, Williams had firsthand knowledge of CBG's assets which comprised the Collateral that secured Bobulinski's loan.  Both the Note and Pledge Agreement were governed by California law.

43.     Bobulinski would not have entered into the Note or Pledge Agreement absent these assurances from Roseman, CBG, its Board, and legal counsel. Bobulinski also negotiated Paragraph 7 of the Pledge Agreement, which required CBG to obtain his written consent before transferring or selling any Collateral.

**Bobulinski Finds a Buyer and CBG Manufactures a Liquidation**

44.     In Fall 2015, Bobulinski introduced CBG to Remark Media Inc., and, on February 18, 2016, Remark executed a Letter of Intent to purchase CBG for $23.5 million, consisting of $7.5 million in cash and 4-year warrants to purchase up to 6.25 million shares of Remark's common stock at an exercise price of $10 per share subject to certain anti-dilution adjustments.  CBG shareholder SIG China Investments Master Fund III LLP ("SIG") had veto rights and opposed the sale. So, at a March 17, 2016 board meeting, CBG's directors, including Roseman, Roche, and Fisch, discussed SIG's opposition to the sale.

45.     In December 2015, the investment banking firm, Houlihan Lokey, prepared and submitted to Remark a pitch deck for the CBG transaction. Key Remark personnel who reviewed the pitch deck, including the company's CFO Doug Osrow ("Osrow"), understood that the primary assets of value in the proposed

acquisition included various assets owned by CBG, including event licenses such as those with Dick Clark Productions for the Billboard Music Awards, the Golden Globes, American Music Awards, Hollywood Film Awards, New Years Rockin' Eve (the "DCP Licenses"), the Rock in Rio music festival, and social media contracts for over 95 celebrities such as Taylor Swift. Osrow has testified that he considered these assets comprised "easily worth more than 20% of the acquisition price" of CBG. David Lande, a seasoned entertainment lawyer who co-founded CBG, testified that these assets had "significant value." These licenses and agreements were featured prominently throughout the nearly twenty-page presentation, which crowed about a "massive" audience for these assets.

46.     Immediately after receiving the pitch deck, Remark showed great interest in CBG's assets, particularly the Chinese broadcast rights in the DCP Licenses. Remark's CFO Osrow perceived these assets, along with the celebrity social media contracts, to represent a significant portion of the value of the proposed transaction to Remark, based upon its CEO's China expansion strategy. In particular, the DCP Licenses, along with lucrative social media contracts involving endorsements from A-list "select key celebrity clients like Taylor Swift and Justin Timberlake" (also featured prominently on page 4 of the pitch deck), were of great value to Remark and its CEO Shing Tao's business plans in China, and were far and away the most valuable assets in the CBG transaction. Within two months of receiving the pitch deck, Remark signed a Letter of Intent to purchase these valuable assets from CBG for $23.5 million, in the form of $7.5 million in cash and four-year warrants to purchase up to 6.25 million shares of Remark's common stock at an exercise price of $10 per share subject to certain anti-dilution adjustments.

47.     On April 11, 2016, Bobulinski signed an amendment to the Note reflecting an increase in his loan to CBG from $500,000 to $650,000 (the "Amendment"). Nothing in the Amendment was intended to affect either CBG's or Bobulinski's rights or obligations under the Note or Pledge Agreement. To the

contrary, the Amendment itself stated, "Except as expressly amended by this Amendment, all of the terms, conditions and provisions of the Note are hereby ratified and continue unchanged and remain in full force and effect."  The Amendment made no changes to the Collateral, meaning that Bobulinski's increased loan amount was secured by the same Collateral as his original loan.  Like the Note and Pledge Agreement, the Amendment was governed by California law.

48.    Less than two weeks later, on April 24, 2016, after receiving a $23.5 million offer from Remark, CBG sent correspondence to its noteholders ("Noteholders"), claiming CBG was unable to meet outstanding  payment obligations, even though no Noteholders were due payments at that time.  Fisch sent this writing at the direction of CBG's Board, and in concert with CBG co-director Roche, who was his boss.

49.    Roche ran CBG's largest creditor, co-Defendant Hickory Grove.  This writing by Fisch purportedly created an "Event of Default" under the Notes so that Hickory Grove could initiate the wind-up process in the Cayman Islands. On April 28, 2016, four days after the manufactured Event of Default, Hickory Grove initiated the wind-up proceeding and applied for the appointment of joint provisional liquidators.

50.    CBG shareholder SIG objected to the appointment of the Joint Provisional Liquidators in the Cayman Islands.  In response, on August 18, 2016, a Cayman court issued a winding up order putting CBG into official liquidation and appointing the JOLs to oversee the liquidation.

**Defendants Violate Bobulinski's Pledge Agreement through a Secret, Fraudulent Transfer of Key Assets out of CBG**

51.    At all relevant times prior to the fraudulent transfer described in detail below, Hickory Grove owned 33% of RAAD, which, at the time of its eventual sale to Remark, purportedly owned the "Collateral" that was supposed to secure Bobulinski's loan.  But RAAD did not in fact "own" the Collateral in any legal

sense – rather, it was a vehicle for a fraudulent transfer of the Collateral out of CBG and to Remark.

52.     CBG and Hickory Grove's creation of the Event of Default and the subsequent wind-up process deprived SIG of its controlling interest in CBG, laying the foundation for CBG to transfer key assets to RAAD, and for CBG to then sell those assets to Remark pursuant to the September 20, 2016 Asset and Securities Purchase Agreement.

53.     As a condition precedent to the APA, Hickory Grove and RAAD's two other shareholders, Hudson Holdings Trust and Tapirdo Enterprises, LLC, a holding company owned by Roseman and his wife, transferred their shares in RAAD to CBG for $10.  Thus, Hickory Grove, within a week of making its own $670,000 "loan" to CBG, initiated wind-up proceedings and thereafter agreed to transfer its shares of RAAD (which, according to the JOLs, owned the Collateral securing Bobulinski's Note) to CBG for $10. The significance of this transaction to Defendants' fraud was unknown to Bobulinski until recently, but known to Defendants all along.  RAAD was in fact a pawn in a fraudulent scheme to squeeze out Bobulinski, avoid his senior security interest, and enrich Defendants such as Robert Roche at Bobulinski's expense.

54.     As part of the APA, CBG, under the continued advisement of Don Williams and Sheppard Mullin, asked its Noteholders to enter into distribution agreements ("Distribution Agreements") subordinating their claims to CBG's unsecured creditors. The Distribution Agreements negated the pledge agreements of all Noteholders, which (like Bobulinski's Pledge Agreement) prevented CBG from transferring pledged assets without the Noteholders' consent. All Noteholders but Bobulinski signed the Distribution Agreements, meaning Bobulinski alone preserved his right to stop any deal by CBG to transfer its pledged assets.  That is because Paragraph 7 of Bobulinski's Pledge Agreement contains the plainly-worded requirement that CBG "not sell, offer to sell, dispose of, convey, assign, or

1  otherwise transfer . . . any of the Collateral," as defined in that agreement, without

2  obtaining Bobulinski's "prior written consent."  Because Bobulinski was the only

3  Noteholder not to sign the Distribution Agreement, he had senior secured status,

4  meaning that his interest in CBG was superior to even Roche's interests.

5      55.  Several Defendants made their feelings toward Bobulinski very clear in

6  their private communications.  A September 8, 2016 email exchange between CBG

7  and Remark personnel makes clear that, although both sides understood the

8  obligation imposed by Paragraph 7 of the Pledge Agreement, they nevertheless did

9  not under any circumstances intend to give Bobulinski what he was owed.  In this

10  correspondence, Remark CEO Shing Tao noted that Bobulinski was upset with

11  Roche and was questioning Roche's credibility "in regards of him living up to what

12  he was promising from the cash distribution."  Roseman responded, characterizing

13  Bobulinski as "[u]nfortunately just a very tough negotiator" and stating that the

14  parties "may need to look at a work around" to obtain Bobulinski's signature on the

15  Distribution Agreement.  Osrow replied truthfully, stating the obvious fact that the

16  "work around" idea floated by Roseman "may be tough – need [Bobulinski] to

17  sign."

18      56.  Although all Defendants ignored Bobulinski's rights under the Pledge

19  Agreement, there can be no doubt they were fully aware of the agreement.  For

20  example, on April 21, 2016—months before the transaction closed—Alexia Adda

21  ("Adda"), an associate at the law firm Walkers LLP ("Walkers"), counsel for the

22  JOLs, sent an email outlining the key terms of the agreements with CBG

23  Noteholders (including Bobulinski) to Fisch, copying Roseman, Williams, JOLs

24  attorney Fraser Hern, and Robert and Theresa Roche.  In this email, Adda represents

25  that, after the deal, Bobulinski would still be paid his principal first, even if he did

26  not sign a Distribution Agreement.  Although this email is inaccurate in some

27  respects, it is an accurate admission that Defendants understood Bobulinski did have

28  senior secured status.  Adda also acknowledges in that same email that California

law governed Bobulinski's agreement.  Since she practiced in the Cayman Islands, Adda asked Williams to weigh in based on "a California law perspective."  The involvement of Don Williams and Sheppard Mullin in this process was thus crucial to Defendants' knowledge of Bobulinski's senior secured status and the impropriety of the fraudulent Asset Transfers: Williams and Sheppard Mullin were CBG's counsel, drafted Bobulinski's Note and the Pledge Agreement that prohibited the transfers, helped negotiate and orchestrate the assignment agreements with the JOLs that effected the Asset Transfers and continued to advise CBG and its liquidators on CBG's creditors' rights throughout the liquidation.

57.     As shown by this email, Defendants, including sophisticated counsel well-versed in California law, knew Bobulinski's rights under the Pledge Agreement.  None of them were under any illusion to the contrary.  On June 13, 2016, Jeremy Novak ("Novak"), the Houlihan Lokey banker on the deal, emailed Roseman, asking for a "cash / warrant breakdown" of the "$1.65mm in value relating to his note" and whether Bobulinski would receive "100% of that amount" upon completion of the CBG transaction.  Novak also asked what Bobulinski would receive as a "finder's fee."  Roseman replied, "I believe so but he and Roche are reaching agreement on this. On the finders fee, it's 250k for putting the deal together and taking it all the way through thx. Cash and warrants split determined by the courts."

58.     These emails definitively show that Defendants knew Bobulinski was a senior secured creditor and that his signature to any waiver of that status was needed.  Nevertheless, Defendants orchestrated a blatant fraud against Bobulinski to deprive him of his creditor rights.

59.     Other emails show that all Defendants were carefully plotting the shell game that involved a last-minute, unauthorized transfer of the Collateral from CBG to RAAD at closing.  On September 5, 2016, despite having drafted the Note and Pledge Agreement and being fully aware of Bobulinski's rights under both

agreements, Williams emailed the JOLs, employees at Grant Thornton Specialist Services Ltd ("Grant Thornton") and their counsel at Walkers, asking the JOLs to assign the DCP Licenses that were part of the Collateral to RAAD before closing. Specifically, Williams emailed the JOLs, and other personnel at Grant Thornton and Walkers, stating that "the assignment of the Dick Clark contracts did not take place pre-appointment.  It will [sic] is contemplated to take place immediately after the planned assignment of RAAD equity from its current owners to RAAD, which must occur prior to closing.  The documentation relating to both these items has been sent to you for review."  Phillip Tyrrell of Grant Thornton responded to this message a day later, telling Williams that he did not believe the JOLs "can assign a pre-appointment debt of the Company to another party absent (i) agreement by the creditor (ii) withdrawal of their POD and (iii) a release of the Company and Liquidators."  Yet, Dickson later feigned ignorance of the fact and the timing of the last-minute transfer of the Collateral.  However, these and other emails show that Dickson, Grant Thornton, and their counsel, Walkers, were not only aware of the last-minute Asset Transfers (which Williams explained to them in detail and helped facilitate) but reviewed and marked up the transaction documents effecting the transfers well in advance of the closing of the transaction.

60.    On September 10, 2016, Williams further emailed a "closing item status summary" to Osrow, copying the JOLs and others, outlining what needed to be done before the Remark transaction closed.  Notably, this chart noted that Bobulinski's signature was still "needed to close/fund the transaction."  Chris Keefe from Walkers responded to this email, advising that the JOLs had reviewed and approved the RAAD Sale and Purchase Agreement and had no further comments.

61.    The deal was supposed to close on September 12, 2016, but it was delayed in part because – despite Roseman's and all Defendants' awareness that Bobulinski, in Osrow's words, "need[ed] to sign" – Bobulinski refused to consent to any waiver of his rights as the now sole senior secured creditor to CBG.  From the

time of the original closing date onward, all of the original documents anticipated in the closing were drafted and essentially final.  However, Roche (principal at Hickory Grove and part owner of RAAD) and Fisch, through CBG and RAAD's counsel, Williams of Sheppard Mullin, were still heavily involved in making last-minute changes to the deal documents, and were, in retrospect, apparently still working on what Roseman called a "work around" to Bobulinski's refusal to sign the Distribution Agreement that would subordinate his rights.

62.     On September 14, 2016, Williams sent an email with eleventh-hour requests for revisions from Roche and Fisch.  These changes on the eve of closing, which frustrated Remark and its counsel, were designed to give Roche and Fisch more control over the Warrants and Warrant Exercise Price that were part of the sale and demonstrate naked self-interest.  By all current evidence in Bobulinski's possession, Roche, Fisch and Williams were the primary parties tinkering with all of the deal documents at the eleventh hour.

63.     Osrow has testified that "[t]hroughout the closing of the CBG deal" he was assured by Tao and Roseman that "they were reasonably confident Mr. Bobulinski would ultimately sign the Distribution Agreement prior to closing."  At all relevant times, Osrow understood that Bobulinski "had to provide prior written consent before CBG could transfer or assign" any of the Collateral.  Lande echoed this understanding, testifying that he understood that, pursuant to Paragraph 7 of the Pledge Agreement, CBG was restricted "from selling, transferring, or assigning any of the company's assets in the United States without the written consent of Bobulinski."

64.     Despite Bobulinski's refusal to sign the Distribution Agreement subordinating his creditor claims, all of the Defendants pushed for the deal with Remark to close with or without Bobulinski's signature.  At the very last minute, they finally found the "work around" they needed for Bobulinski's refusal to waive his rights – a secret, fraudulent transaction to transfer the Collateral securing

1   Bobulinski's interest in his Note and Pledge Agreement, that directly contravened

2   the language of that latter agreement.

3        65.   On or about September 19, 2016, the three RAAD shareholders

4   transferred their shares to CBG for $10 (a ridiculous sum that would make a conman

5   blush), thereby making RAAD a subsidiary of CBG the day before the sale to

6   Remark. The $10 sale of RAAD to CBG on the eve of closing – while it made little

7   sense on its own – was the initial vehicle through which Defendants perpetrated

8   their fraudulent scheme to deny Bobulinski of his security interest.  The reason it

9   was significant was that, unbeknownst to Bobulinski, on the day of the closing CBG

10   assigned to RAAD key assets that secured Bobulinski's loan from CBG, including

11   the valuable DCP Licenses.  Specifically, CBG and RAAD entered into an

12   Assignment and Assumption Agreement (the "AAA"), which assigned the DCP

13   Licenses from CBG to RAAD. Notably, Hugh Dickson for the JOLs signed the

14   AAA on behalf of RAAD. CBG then entered into the APA to sell its subsidiaries

15   (but not the parent) to Remark, including its shares of RAAD.

16        66.   All of the parties to this transaction had to know that the $10 sale of

17   RAAD to CBG had no value to any of the parties to it, other than to enable a

18   complicated corporate shell game to empty CBG of key assets and avoid its secured

19   debts.  When the $10 RAAD sale was combined with a secret Assumption and

20   Assignment Agreement transferring the DCP Licenses from CBG to RAAD on the

21   day of the sale, the fraudulent transfer was complete.  This transaction, completely

22   concealed from Bobulinski until recently, and only ascertained in depositions taken

23   in April 2021, paved the way for the JOLs to deny Bobulinski's creditor claim and

24   then to actively conceal the fraudulent transfer during Bobulinski's Proof of Debt

25   claim in the Cayman Islands.

26        67.   Defendants knew the Asset Transfers violated the consent provisions of

27   Bobulinski's Note and Pledge Agreement, including Paragraph 7 of the Pledge

28   Agreement, which specifically required Bobulinski's written consent to any transfer

WAYMAKER

of Collateral from CBG to any other entity. Several emails between Eisner, LLP (known as Eisner Jaffe at the relevant time), Osrow, and others on September 20, 2016 show that Defendants knew they still had not obtained Bobulinski's signature on a Distribution Agreement, but they pressed ahead with the deal anyway. They took great care to hide it even from the purchaser, Remark.

68. For example, at the time of the CBG transaction, Remark's primary point person on the transaction, Osrow, believed that Bobulinski was CBG's most senior creditor and was first in line to be paid. Osrow was told by Roseman, Tao, and others that Bobulinski would sign the Distribution Agreement prior to closing. At the time of the transaction, Osrow had not reviewed Bobulinski's Pledge Agreement and was not aware of the requirement in Paragraph 7 that CBG not sell, offer to sell, dispose of, convey, assign or otherwise transfer . . . any of the Collateral" as defined in that agreement, without Bobulinski's "prior written consent." Even though Osrow worked closely on the deal, Defendants kept him in the dark about the Asset Transfers, of which he was not aware until well after the transaction closed.

69. Osrow, who, as CFO of Remark, was deeply familiar with the appropriate way to conduct corporate transactions, has averred under oath that he would have immediately alerted senior Remark management if he had seen the Asset Transfers. Osrow has testified that, if he had seen the Asset Transfer documents at the time and thought assets were being moved from CBG to evade creditors, "it would have immediately set off alarm bells for [him.]" He has further averred: "Based on my prior financial experience, I would have immediately alerted senior management, including Mr. Tao, and counsel with any such concerns about the Asset Transfer documents, because I would have believed that did not pass the smell test, was improper, and, in this case, it was clear to me that Mr.Bobulinski was a senior secured lender." Lande has testified similarly, saying that the Asset

1  Transfers would have "raised red flags" for him had he known about them at the

2  time.

3      **Bobulinski Is Forced to File a Proof of Debt in the Cayman Islands**

4      70.    Remark's purchase constituted a "Liquidity Event" under the Note, and

5  so CBG was required to pay Bobulinski's principal loan amount with the promised

6  2.5x return (totaling $1,625,000) upon the close of the sale to Remark.  As a senior

7  secured creditor of CBG, whose loan was secured by the Collateral, Bobulinski

8  therefore submitted a Proof of Debt to the JOLs during the Cayman Liquidation for

9  $1,625,000, plus legal fees. The JOLs rejected the Proof of Debt, claiming

10  Bobulinski was only owed a return of his principal of $650,000 and Global

11  Investment Ventures, LLC was entitled to a $224,775 finder's fee. The JOLs also

12  claimed Bobulinski's Note was not secured by the Collateral.

13      71.    After receiving notice from the JOLs of their rejection of his Proof of

14  Debt, Bobulinski immediately emailed CBG's CEO Adam Roseman and its counsel,

15  Don Williams, asking for an explanation for the JOLs' rejection of his Proof of

16  Debt, in light of his Note and Pledge Agreement and the repeated assurances he had

17  been given by CBG that he was fully covered by both documents.  Williams

18  responded, on behalf of CBG, stating that CBG would do nothing.

19      72.    Had Bobulinski been aware of the Asset Transfers and wrongful

20  conduct by the Defendants, Bobulinski would have brought a tort action in

21  California against the Defendants in California, where he would have been allowed

22  discovery on the transactions that led to the liquidation and/or injunctive relief to

23  stop it.  As it was, however, he had no such knowledge and no choice but to try to

24  appeal the Proof of Debt decision in the Cayman Court, where he was denied any

25  discovery rights. In the Cayman Litigation that ensued, the JOLs argued that

26  Bobulinski was not a secured creditor because RAAD (an entity Roseman had never

27  mentioned to Bobulinski), and not CBG, owned the Collateral.  This argument also

28  served as the basis for the Cayman Court's conclusion that CBG did not breach

Paragraph 7 of the Pledge Agreement, which required Bobulinski's consent before CBG could transfer assets to Remark.

73.     The JOLs justified closing the Remark transaction without Bobulinski's approval and signature by arguing CBG had simply transferred shares of RAAD and not assets comprising the Collateral.  While Roseman represented that CBG's content library and license agreements were in the U.S., he did not distinguish which U.S. library and license agreements belonged to RAAD as opposed to CBG.  Nor did Bobulinski at this time have any awareness that CBG, under the advisement of Williams and Sheppard Mullin, had entered into a series of assignment agreements countersigned by Hugh Dickson for the JOLs, on behalf of RAAD, to transfer key CBG assets to RAAD on the eve of the sale to Remark.

74.     Based on an incomplete and false record, the Grand Court of the Cayman Islands rejected Bobulinski's appeal on January 23, 2019 (the "Cayman Judgment"). After the rejection of Bobulinski's Proof of Debt was affirmed, the JOLs sought costs they had incurred for the litigation against him under Cayman law which awards costs to the prevailing party. Ultimately, the Cayman Court issued three cost certificates against Bobulinski: (1) $56,431.82 on November 13, 2018, (2) $57,208.58 on January 8, 2019, and (3) $562,170.94 on February 5, 2019 (collectively, the "Cost Orders").  Meanwhile, Bobulinski has still not been paid even the principal on his Note.

**Bobulinski Sues Roseman for Fraud**

75.     On February 21, 2019, Bobulinski sued CBG's former CEO in California state court for (1) fraud in the inducement, (2) negligent misrepresentation, and (3) breach of fiduciary duty. Bobulinski alleged that, to induce him to loan $650,000 to CBG, Roseman misrepresented CBG's assets when the parties entered into the Note and Pledge Agreement in April 2015 and Amendment in April 2016, which assets Roseman promised Bobulinski would secure his loans.

76.     Based on his understanding of the facts at the time he filed the complaint against Roseman, Bobulinski alleged that CBG did not own the assets that Roseman said secured his loan at the time the parties entered into the Note and Pledge Agreement. Roseman removed the case to the Central District of California on April 17, 2019. On July 10, 2019, Bobulinski filed his first amended complaint, and, after motion practice, ultimately proceeded on two claims: (1) fraud in the inducement, and (2) negligent misrepresentation. (Case No. 2:19-cv-02963-MWF-SSx (the "Roseman Matter").)

**The JOLs Seek to Enforce the Cayman Judgment and Cost Orders**

77.     On July 28, 2020, CBG, by and through the JOLs, sued Bobulinski in the Central District of California, alleging that, pursuant to the Uniform Foreign-Country Money Judgments Recognition Act, Cal. Civ. Proc. Code § 1713, *et seq*., and the principles of comity, the United States should recognize and enforce the Cayman Judgment and Cost Orders the JOLs had obtained in the Cayman Islands against Bobulinski for litigating his Proof of Debt claim.  On September 18, 2020, nearly two weeks before Bobulinski's responsive pleading was due, without any prior discussion or notification, CBG filed a motion for summary judgment.  After being served with the motion, Bobulinski reached out to CBG to meet and confer, given that no discovery had yet occurred, but CBG refused.  On October 22, 2020, the Court denied CBG's motion for failure to meet and confer.

78.     After the Court denied the motion, CBG asked to meet and confer on its anticipated second summary judgment motion, which would be brought on the same grounds as the first. During meet and confer, Bobulinski reiterated his need for discovery, but CBG refused to reconsider its motion. On November 3, 2020, both parties served written discovery.  Six days later, on November 9, 2020, CBG filed its second motion for summary judgment.  On November 16, 2020, Bobulinski served deposition notices to CBG and Hickory Grove.

79.     After Bobulinski pointed out another procedural error in his opposition to CBG's motion, CBG withdrew its second motion and filed a third motion for summary judgment on November 17, 2020, again on the same grounds and again before Bobulinski received any discovery. Bobulinski opposed again, arguing summary judgment was premature under Federal Rule of Civil Procedure 56(d), since he had not had the chance to obtain any discovery in this matter or the underlying Cayman Litigation.

80.     On December 3, 2020, CBG served only objections to Bobulinski's first set of written discovery.  Bobulinski never received a single answer or document in response to his discovery and never conducted a deposition.

**The U.S. District Court Grants Summary Judgment in CBG's Favor**

81.     On January 25, 2021, the district court granted CBG's third motion, granting summary judgment in its favor.  In making its ruling, the Court noted the remaining balance on the Cost Orders was $634,393.52, and post-judgment interest was 2.375%.  Thus, on February 18, 2021, the Court entered judgment against Bobulinski in the amount of $662,855.95, plus costs of suit. On March 22, 2021, Bobulinski timely filed a notice of appeal.

82.     On February 19, 2021, CBG submitted an Application to the Clerk to Tax Costs in the amount of $645.00.  Four days later, on February 23, 2021, CBG filed a motion for attorneys' fees ("Fee Motion"), arguing it was entitled to all fees incurred in "enforcing" a foreign judgment in the United States pursuant to California Code of Civil Procedure § 685.040 because the district court had recognized the Cayman Judgment, which itself provided for attorneys' fees.

83.     The JOLs sought all fees incurred from the inception of the case, including fees incurred for their procedurally defective motions and a prejudgment attachment. On March 31, 2021, the district court denied the Fee Motion on the grounds that the Cayman Judgment and Cost Orders were obtained pursuant to Cayman law, not pursuant to any "statute that California courts have recognized as a

1  basis to support an award of attorneys' fees under 685.040." On April 27, 2021,

2  CBG timely filed a notice of appeal.

3  **Bobulinski Learns Defendants Secretly Transferred Assets**

4  84.    Meanwhile, Bobulinski vigorously prosecuted the Roseman Matter

5  with party and third-party discovery. On March 31, 2021, Roseman produced a

6  series of assignment agreements, showing that CBG and its JOLs had transferred

7  assets that CBG told Bobulinski secured his loan to a separate company, RAAD,

8  which became a wholly owned subsidiary of CBG the day before the sale to

9  Remark. Bobulinski deposed Roseman on April 15, 2021.

10  85.    During that deposition, Roseman testified that he used CBG and

11  RAAD interchangeably, even admitting that he signed an agreement to make RAAD

12  a wholly owned subsidiary of CBG for one day before CBG was sold to Remark "to

13  formally bend in [RAAD] from a legal perspective, I believe, into CBG."  Roseman

14  testified under oath that he did not tell Bobulinski about this because "the assets

15  were – were remaining – all being done at the same time within CBG's umbrella."

16  Roseman also admitted that the assets that he transferred through the assignments

17  were the same ones he told Bobulinski would secure his loan to CBG.

18  86.    At Roseman's deposition, Bobulinski pieced together the puzzle of the

19  fraud: the Cayman court found that CBG had "no assets" that would secure

20  Bobulinski's loan because CBG and its JOLs secretly transferred license agreements

21  and other assets that had secured Bobulinski's loan to RAAD on the eve of the sale

22  to Remark; and they did this without Bobulinski's knowledge or consent.

23  87.    Based in part on these revelations, Bobulinski amended his complaint

24  in the Roseman Matter to add allegations based on the newly discovered evidence.

25  The Court allowed the amendment, agreeing with Bobulinski that he "pieced

26  together the facts" of the Asset Transfers only after deposing Roseman about them

27  on April 15, 2021.

28

88.     In the interim, on July 9 and 16, 2021, Bobulinski deposed Hugh Dickson in the Roseman Matter. At his deposition, Dickson acknowledged the Asset Transfers, but he could not explain why he and the JOLs had not disclosed them. However, Dickson was a signatory to the Assignment and Assumption Agreement effecting the Asset Transfers, for the JOLs on behalf of RAAD, on the day of the closing, and was intimately aware of both the Collateral and Bobulinski's sole secured claim to it.  In fact, as noted herein, Williams explained in writing the effect and last-minute timing for the planned transfers to the JOLs and its law firm, Walkers, which then reviewed and revised the transaction documents relating to the transfers without any objection to the Asset Transfers.  Furthermore, as other documents such as the April 21, 2016 email from Walkers associate Alexia Adda clearly show, all Defendants were aware of Bobulinski's senior secured status. Furthermore, while it was not clear to Bobulinski until deposing Roseman, to those involved in the transaction at the time the Asset Transfers were clear in their purpose and effect.  For example, the agreement effecting the move of the DCP Licenses from CBG to RAAD is merely five pages long. On page one, it indicates that it is transferring the very same assets that were prominently featured in the pitch deck to Remark that resulted in Remark's interest in CBG's assets to begin with. Finally, and most importantly, emails between Williams, Walkers and the JOLs (including Hugh Dickson) (*see* paragraphs 55-62, above) show not only that the JOLs and Walkers knew about the last-minute Asset Transfers but that they were aware of the plan to transfer them at the closing of the transaction and even marked up the transaction documents ahead of time.

89.     Osrow has also averred under oath as to the value of the DCP Licenses to Remark in the transaction, stating: "Based upon my review of the pitch deck [for the transaction] and the China strategy of Shing Tao, Remark's CEO, these assets represented a significant portion of the value of the proposed transaction. Specifically, I considered that Dick Clark Productions (Billboard Music Awards, the

Golden Globes, American Music Awards, New Years Rockin Eve), the Rock in Rio music festival, and their produced and partnered content were the most valuable assets to Remark in the proposed transaction because of Shing Tao's strategy in China, easily worth more than 20% of the acquisition price noted below."

**Bobulinski Files An Appeal in the Cayman Islands and Wins**

90.     On October 4, 2021, Bobulinski moved the Cayman Court of Appeal for leave to appeal the Cayman Judgment and Cost Orders on the grounds that new evidence has been obtained that is credible, could not have been obtained with reasonable diligence at the time of trial, and which would have had an important influence on the result of the case if it had been available to the trial judge.

91.     On December 5, 2022, the Cayman Court of Appeal heard Bobulinski's appeal and, on March 31, 2023, it issued a ruling (the "Cayman Appeal Ruling," attached hereto as Exhibit A) in which it found that the JOLs had failed to disclose: (1) the Assignment and Assumption Agreement, in which CBG's CEO and the JOLs transferred certain licenses of CBG to RAAD on the eve of the sale of CBG's assets to Remark and (2) the Disclosure Schedule of the APA for that sale, which listed those licenses.

92.     The appellate court found that the JOLs' failure to disclose these facts meant that the appeal over Bobulinski's Proof of Debt "was decided against [Bobulinski] on a fundamentally false basis," and that Bobulinski therefore has "a reasonably arguable case that he is a secured creditor with a right to trace into the sale proceeds under the APA that are attributable to the licenses" at issue. As a result, Bobulinski "should be entitled to bring a fresh appeal . . . to establish his status as a secured creditor and the consequences that flow therefrom."  The court rejected the JOLs' contention that there should not be a second appeal as "misconceived."

93.     Based on these findings, the Cayman Court of Appeal modified the Cost Orders which were the subject of the JOLs' Complaint against Bobulinski in

the U.S. district court: "[h]aving regard to the JOLs' failure to disclose the AAA in the appeal, the costs order made by the Grand Court below should be varied so as to order (1) that the JOLs be paid 70% of their costs," reflecting their success on certain issues in the appeal, and that Bobulinski "be awarded 30% of his costs" based on the JOLs' failure to disclose the AAA.

94.   The Cayman Court of Appeal further held that "the JOLs must restore to [Bobulinski] 30% of the costs he has paid to the JOLs under the Grand Court Order." The court required that certain of these costs be "met from the JOLs' own resources and not from the insolvent estate," including "[t]he costs incurred by the JOLs in resisting this appeal [in the Court of Appeal]," 30% of the costs incurred by the JOLs in the Court below, Bobulinski's costs in the Court of Appeal, and "reimbursement to [Bobulinski] of 30% of the costs he has paid to the JOLs under the costs order." Both parties were allowed to file additional written arguments on the judgment and amount of costs.

95.   On July 26, 2023, the Cayman Court of Appeal issued its Certificate of Order, affirming the Cayman Appeal Ruling and holding that Bobulinski "has leave to bring a fresh appeal in the Grand Court in which he claims he is a secured creditor with a right to trace into the proceeds of the APA in the realisation of this security interest in relation to" eight license agreements, two content distribution agreements and a series of social media/celebrity contracts. In addition, the Cayman Court of Appeal affirmed its modifications to the Cost Orders.

96.   The court also ordered the JOLs to pay Bobulinski's "costs of the Appeal to be taxed on the standard basis if not agreed," and that those costs "should also be paid out of the JOLs' personal resources and not out of the liquidation estate."

97.   Bobulinski now seeks redress in this Court for the further harm he has suffered due to Defendants' brazen fraudulent transaction, which was set in motion before any of the litigation noted above ever ensued (and would have avoided most

if not all of it).  The specific fraudulent transactions, misrepresentations and roles in the scheme are outlined in further detail in the following sections.

### The Roches, Hickory Grove and Fisch Are Culpable in the Fraud

98.     Robert Roche was a director of CBG and the principal of Hickory Grove, an entity he wholly controlled.  Fisch, who worked for Roche, was also a director of CBG.  Roche and Fisch, along with all other Noteholders, signed Distribution Agreements, subordinating their creditor claims in CBG to the body of unsecured creditors.  Theresa Roche of Hickory Grove, an entity controlled entirely by her brother Robert Roche, signed such an agreement on behalf of Hickory Grove.

99.     Notably, Bobulinski was the only Noteholder who refused to sign the Distribution Agreement, meaning that his Pledge Agreement and all rights thereunder, including the requirement that any sale or transfer of CBG's assets be approved by him, remained valid.  At all times, Robert Roche — as a director of CBG's Board and Noteholder — as well as his sister Theresa were well aware of Bobulinski's rights as a secured creditor and his claim to all of the U.S. assets of CBG.  Despite knowing these facts, Hickory Grove and the Roches pushed CBG to enter liquidation and never once identified Bobulinski as a secured creditor to the JOLs; to the contrary, Robert Roche continually concealed the Asset Transfers from Bobulinski and sanctioned representations in the Statement of Affairs filed in the Cayman Islands to the contrary.

100.    During the liquidation of CBG in 2016, Bobulinski submitted a Proof of Debt for the $650,000 principal, plus the 2.5x multiplier he was owed under the Note and Amendment he had entered into with CBG, fully expecting to be compensated from the sale of CBG's assets to Remark, given that he was the only remaining secured creditor in the company.  He presented a creditor claim for $1,875,000, which included distributions to Global Investment Ventures, LLC, and is what CBG's CEO Roseman represented to Bobulinski that he would be paid.  To Bobulinski's shock, however, the JOLs determined in late January 2017 that he was

1   not a secured creditor, claiming that there were no assets that would secure

2   Bobulinski's loan.  Even though Hickory Grove and Robert Roche certainly knew

3   that CBG had assets to secure Bobulinski's loan (including the DCP Licenses) and

4   knew Bobulinski was a secured creditor, they continually concealed the Asset

5   Transfers from Bobulinski and sanctioned statements in the Statement of Affairs

6   that was required as part of the Cayman Liquidation and early on in the winding up

7   and liquidation process directly to the contrary.  The Statement of Affairs affirming

8   that CBG had no secured creditors was simply false.

9          101.   By participating in the scheme to conceal the fraudulent Asset

10   Transfers and sanctioning the fraudulent Statement of Affairs, together with

11   transferring Hickory Grove's shares in RAAD to CBG and failing to obtain

12   Bobulinski's approval for the Asset Transfers as the Pledge Agreement required,

13   Hickory Grove and the Roches participated in a fraudulent conspiracy that ensured

14   that CBG was cleared of key assets and creditors at the time of the sale to Remark

15   and that Bobulinski was determined to be an unsecured, rather than a secured,

16   creditor when he submitted his Proof of Debt in the Cayman Islands.

17          102.   On or about September 19, 2016, the three shareholders of the separate

18   entity, RAAD – Hickory Grove, Hudson Holdings Trust and Tapirdo Enterprises,

19   LLC, a holding company owned by Roseman and his wife – transferred their shares

20   in RAAD to CBG for the farcical sum of $10, thereby making RAAD a subsidiary

21   of CBG the day before the sale to Remark.  On or about September 19 and 20, 2016,

22   on the eve of the sale to Remark, CBG and the JOLs then transferred key CBG's

23   assets that secured Bobulinski's loans to CBG, including the DCP Licenses, out of

24   CBG to RAAD.  This Asset Transfer, completely concealed from Bobulinski until

25   recently, was the lynchpin of the entire transaction between Remark and CBG.  Its

26   concealment facilitated the transaction with Remark.

27

28

103.   These secret transactions compromised Bobulinski's claims in the proceedings that followed and induced him to forgo rights and actions at the time that would have made him whole.

### MGG Is Culpable in the Fraud

104.   MGG worked hand-in-hand with Remark on the financing and due diligence of the CBG acquisition, along with Remark's attorneys at Eisner. However, this transaction did not proceed because CBG's B Preferred Shareholder, SIG, exercised a right of veto to block the sale.

105.   On August 18, 2016, the Cayman Court sanctioned the sale of CBG's assets to Remark that SIG had earlier blocked.  The Court was never informed of the Asset Transfers from CBG to RAAD.  That same day, CBG asked all secured creditors who had entered into Notes with CBG, including Bobulinski, to sign a Distribution Agreement to subordinate their claims to CBG's general body of unsecured creditors.  Notably, Bobulinski was the only Noteholder who refused to sign the Distribution Agreement, meaning that his Pledge Agreement and all rights thereunder, including the requirement that any sale or transfer of CBG's assets be approved by him, remained valid.  At all times, MGG was well aware of Bobulinski's rights as a secured creditor and his claim to all of the U.S. assets of CBG.  Accordingly, MGG also knew or should have known that any transfer of those assets directly or indirectly – would require Bobulinski's consent, and also knew (as did all relevant parties) that he was withholding that consent absent a resolution of his creditor claims.  MGG further knew that Bobulinski's consent was not given as of the day of closing and was aware of the imminent Asset Transfers that would violate the Pledge Agreement.  MGG nevertheless proceeded with the closing and the last-minute Asset Transfers.

106.   The secret Asset Transfers were such an essential part of the overall transaction that it frankly strains credulity to believe that the architects representing Remark's side of the transaction (and conducting diligence on its behalf) could be

1  unaware of these transactions (and their purpose to deplete CBG of Collateral and

2  avoid Bobulinski's secured interest in that Collateral).

3  **Dickson, Grant Thornton and Walkers Are Culpable in the Fraud**

4  107.   In addition to contemporaneous written and oral statements made to

5  Bobulinski, the Pledge Agreement itself memorialized these same assurances.

6  Specifically, pursuant to Section 2(a) of the Pledge Agreement, Bobulinski's loan to

7  CBG was secured by "Collateral," defined as "all assets (including intangible assets)

8  of CBG in the U.S., including without limitation its content library, license

9  agreements, and physical assets, such as production equipment (the Collateral)."

10  Importantly, pursuant to Paragraph 7 of the Pledge Agreement, CBG agreed not to

11  sell or dispose of any of the "Collateral" without the "prior written consent" of

12  Bobulinski.  The Pledge Agreement was governed by California law.

13  108.   There can be no doubt that the JOLs, Grant Thornton and Walkers were

14  aware of Bobulinski's rights under these agreements at all relevant times.

15  109.   In addition to having clear documentation of the Collateral and

16  Bobulinski's rights under the Note and Pledge Agreement, the JOLs and their

17  counsel were repeatedly advised by CBG's CEO Roseman of the value of CBG's

18  Collateral.  In August 2016, weeks before the sale to Remark, Roseman sent a series

19  of emails to the JOLs and their lawyers at Walkers, advising them of the value of the

20  CBG-owned licenses and the need to maintain those licenses for the upcoming sale

21  to Remark.  On August 17, 2016, Roseman emailed Walkers personnel, Theresa

22  Roche, and her sister Jean Roche, warning of the "high importance" of paying the

23  license fees for Rock in Rio, Dick Clark and FailArmy, as such licenses were "well

24  past due and nearing potential termination (thus harming the value of the business to

25  Remark)."  Roseman wrote in his email that, absent the Court sanction of the

26  licenses, "we run much greater risk that Remark pulls the plug." That same day,

27  Roseman also wrote to Hugh Dickson of the JOLs and Mike Saville ("Saville") at

28  Grant Thornton, warning them that we "run the risk for losing this license" for the

People's Choice Award if license fees were not paid, which would mean "a greater risk that Remark pulls the plug." In response, Saville asked for "more detail, what company needs to do, turnover/profit at risk, any other cashflow issues so Walkers can consider using if they have to" and to "explain why Remark might walk as a consequence of this and if no approval tomorrow." That same day, Roseman emailed back that the licenses owned by CBG generated hundreds of thousands of dollars each year for the company, stating that he estimated that the People's Choice license added approximately $100,000 USD to the annual gross profit of CBG, Dick Clark represented approximately $500,000 USD annual gross profit and Rock in Rio represented approximately $200,000 USD annual gross profit.

110.   Despite their obvious awareness of CBG's ownership of the Collateral that secured Bobulinski's loans to CBG and the value of that Collateral, the JOLs nonetheless rejected Bobulinski's Proof of Debt on the false grounds that he was not a secured creditor in the company because CBG had no assets.  At all times, the JOLs concealed from Bobulinski that they themselves, through Hugh Dickson, had transferred the assets out of CBG to RAAD on the eve of the sale to Remark through the Asset Transfers.

111.   Notably, Dickson (along with many of his colleagues at Grant Thornton and a number of Walkers attorneys) was copied on many of the emails described above that showed he not only knew that CBG had assets after the JOLs were appointed and after the Cayman Court approved the transaction, but he also knew of the planned transfer of those assets out of CBG without further court approval or any disclosure to Bobulinski.

112.   The CBG license agreements were not owned by RAAD until the closing date of the APA.  Prior to that, they were owned by CBG at all material times and were, as a result, covered by Bobulinski's Pledge Agreement. But the JOLs and Walkers never revealed to Bobulinski that CBG transferred its licenses to RAAD on the day of sale, and that those assets were U.S. assets falling within the

definition of Collateral in the Pledge Agreement. Instead, the JOLs repeated that there was "no evidence" that such assets existed.

113.   The JOLs and Walkers' statements to Bobulinski after the Asset Transfers were wholly inconsistent with the state of affairs that was known to them at the time those statements were made.  In such a way, the JOLs and Walkers interfered with Bobulinski's creditor rights and defrauded him of what he was owed pursuant to the Note, Pledge Agreement and Amendment.

114.   On March 31, 2023, the Cayman Court of Appeal ruled that the JOLs had withheld critical information from Bobulinski and the Cayman Islands courts during the litigation over Bobulinski's Proof of Debt.  Specifically, the Cayman Court of Appeal found that, the JOLs failed to disclose (1) the AAA, in which CBG and the JOLs transferred certain licenses of CBG to RAAD on the eve of the sale of CBG's Subsidiaries to Remark, and (2) the Disclosure Schedule of the Asset Purchase Agreement for that sale, which listed those licenses.  The Cayman Court of Appeal found that the JOLs' failure to disclose the AAA and the Disclosure Schedule meant that the appeal over the JOLs rejection of Bobulinski's Proof of Debt "was decided against [Bobulinski] on a fundamentally false basis."  Moreover, on July 26, 2023, the Cayman Court of Appeal ruled that – based upon the concealment of the Asset Transfers and related facts – "Appellant [Bobulinski] has leave to bring a fresh appeal in the Grand Court in which he claims he is a secured creditor."

115.   The JOLs and their counsel knew, or should have known, that Bobulinski was a senior secured creditor in CBG who had signed the Pledge Agreement.  Unlike Bobulinski, the JOLs and their counsel knew, or should have known, about the Asset Transfers at the time Remark acquired CBG's assets in 2016.  By failing to obtain Bobulinski's approval for those Asset Transfers, as the Pledge Agreement required, together with fraudulently concealing materials facts regarding these transactions, the JOLs and their counsel participated in a fraudulent

1  conspiracy that ensured that CBG was cleared of key assets at the time of the sale

2  and that Bobulinski was determined to be an unsecured, rather than a secured

3  creditor, when he submitted his Proof of Debt in the Cayman Islands.

4  **Don Williams and Sheppard Mullin Are Culpable in the Fraud**

5  116.   As the authors of the Note and Pledge Agreement, Don Williams and

Sheppard Mullin were well aware of the Collateral securing Bobulinski's claims, the

6  prohibition against transfer of that Collateral in the Pledge Agreement, the operation

7  of California law prohibiting the transfers, and the fraudulent nature of the Asset

8  Transfers (along with the active concealment of these facts from Bobulinski and

9

10  others throughout the Cayman Liquidation and subsequent to the liquidation).

11  117.   Williams and Sheppard Mullin, as counsel to both CBG and RAAD,

12  drafted the Notes and Pledge Agreements for all Noteholders, including Bobulinski.

13  Williams and Sheppard Mullin knew that Bobulinski was the senior secured creditor

14  of CBG, that Bobulinski's loans to CBG were secured by the Collateral and that the

15  DCP Licenses were included in the Collateral. Williams also served on CBG's

16  liquidation committee.  Yet, Williams and Sheppard Mullin participated in the

17  transfer of key assets that secured Bobulinski's loan to RAAD just before the sale to

18  Remark.  Specifically, in September 2016, Williams and Sheppard Mullin

19  participated in a series of phone calls and emails in which Williams told the JOLs

20  and Remark that CBG's "indebtedness" needed to be revised.  On September 5,

21  2016, Williams emailed the JOLs, Grant Thornton and their legal counsel that the

22  "assignment of the Dick Clark contracts did not take place pre-appointment," but

23  was instead "contemplated to take place immediately after the planned assignment

24  of RAAD equity from its current owners to CBG, which must occur prior to

25  closing" and that he had sent documentation to the JOLs for that purpose.  In

26  response, Phillip Tyrrell ("Tyrrell") of Grant Thornton emailed Williams that the

27  JOLs had only minor revisions to the assignment agreements themselves but that he

28  was concerned about the legality of the assignments, telling Williams that "I don't

believe the JOLs can assign a pre-appointment debt of the Company to another party absent (i) agreement by the creditor, (ii) withdrawal of their POD [Proof of Debt] and (iii) a release of the Company and Liquidators."]  Williams then wrote Roseman that the DCP Licenses were not a "debt," but, if Tyrrell were right, they would need to "assign the contract from CBG to Remark or Kankan."  But when Roseman emailed Williams for copies of the assignment agreements to show to Dick Clark Productions for approval, Williams responded that "Walkers is marking up the consent to assignment to fulfill the various requirements the JOLs are imposing in order to be willing to sign it." Of course, Dickson of the JOLs did in fact later sign those assignment agreements, which transferred key CBG assets to RAAD.

118.   In short, Williams and Sheppard Mullin unabashedly laid out the timing and purpose of the Asset Transfers in emails to the JOLs, Grant Thornton and Walkers well ahead of closing, and Williams and Sheppard Mullin appear to have also authored critical transaction documents reflecting these transfers with full knowledge that they were prohibited, despite knowing the entire time that Bobulinski was a senior secured creditor in CBG whose loan was secured by CBG's Collateral.

119.   These Defendants' conduct went well beyond the bounds of fair advocacy for a client and crossed into the realm of individual culpability for fraud.

### **FIRST CAUSE OF ACTION**

### **(Fraud against All Defendants)**

120.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

121.   Defendants made various representations (and concealed or omitted other material facts with fraudulent intent) to Bobulinski related to Bobulinski's status as CBG's senior secured creditor, the assets that secured his loans to CBG, and the amounts he was owed under his Note and Pledge Agreement.

122.   These representations, omissions and concealment were false, and Defendants knew they were false at the time they made them.

123.   Bobulinski reasonably relied on such misrepresentations, omissions and concealment made by Defendants and had no reason to believe that they were untrue.

124.   Defendants' misrepresentations, omissions and concealment are the actual and proximate cause of these damages because Bobulinski reasonably relied on these statements in (1) investing in CBG, (2) submitting his Proof of Debt in the Cayman Islands and litigating the rejection of the Proof of Debt, and (3) investing funds earmarked for investment in another opportunity in CBG with the expectation that he would get a return on his investment in the company.

125.   As a direct and proximate cause of Defendants' actions, Bobulinski has suffered damages of tens of millions of dollars (and, including lost profits, in excess of $100 million).

126.   Bobulinski is informed and believes, and based thereon alleges, Defendants' conduct was performed with a conscious disregard of Bobulinski's rights, such as to constitute oppression, fraud, or malice, thereby rendering Defendants liable for punitive damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Civil Conspiracy to Commit Fraud against All Defendants)

127.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

128.   Defendants, and each of them, were aware that Bobulinski was the senior secured creditor of CBG, that CBG had assets that secured Bobulinski's loan that were subsequently transferred to RAAD, and that Bobulinski's approval was required to transfer key assets out of CBG.

129.   Defendants, and each of them, combined and agreed with each other and/or others to defraud Bobulinski and interfere with his creditor rights.

130.   Defendants, and each of them, acted in concert to support their common purpose of defrauding Bobulinski and interfering with his creditor rights.

131.   Each Defendant committed at least one overt act in furtherance of such conspiracy including misrepresenting and/or failing to disclose Bobulinski's creditor status, the true nature of CBG's assets, that key assets were transferred out of CBG on the eve of the sale to Remark and that Bobulinski's consent was required before any assets could be transferred out of CBG.

132.   Defendants' conspiracy to defraud Bobulinski and interfere with his creditor rights are the actual and proximate cause of Bobulinski's damages.

133.   As a direct and proximate cause of Defendants' actions, Bobulinski has suffered damages of tens of millions of dollars (and, including lost profits, in excess of $100 million).

134.   Bobulinski is informed and believes, and based thereon alleges, Defendants' conduct was performed with a conscious disregard of Bobulinski's rights, such as to constitute oppression, fraud, or malice, thereby rendering Defendants liable for punitive damages in an amount to be proven at trial.


## THIRD CAUSE OF ACTION

### (Common Law Fraudulent Transfer against
### Hugh Dickson and Grant Thornton Specialist Services Ltd.)

135.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

136.   Hugh Dickson, on behalf of RAAD, transferred key assets from CBG to RAAD with actual intent to hinder, delay or defraud creditors of CBG, including Bobulinski. Dickson was one of CBG's Joint Official Liquidators and employed by Grant Thornton at the time of the Asset Transfers.

137.   CBG became devoid of assets necessary to secure Bobulinski's creditor claim against CBG as a result of the Asset Transfers that Hugh Dickson effectuated.

138.   This conduct was done with oppression, fraud, and malice, as defined in Civil Code section 3294, entitling Bobulinski to, in addition to the actual damages, exemplary or punitive damages for making an example of Defendants and to punish the Defendants.

## FOURTH CAUSE OF ACTION

**(Aiding and Abetting Common Law Fraudulent Transfer against Robert Roche, Hickory Grove, Theresa Roche, Jake Fisch, Sheppard Mullin, Don Williams, Phillip Tyrrell, Walkers and MGG)**

139.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

140.   Plaintiff is informed and believe that Robert Roche, Hickory Grove, Theresa Roche, Jake Fisch, Sheppard Mullin, Don Williams, Phillip Tyrrell, Walkers and MGG provided substantial assistance to Hugh Dickson and Grant Thornton in order to hinder, delay and defraud CBG's creditors, including Bobulinski.  Among other things, these Defendants orchestrated the transfer of assets out of CBG on the eve of the sale to Remark so that CBG would have no assets that would secure Bobulinski's loans to the company.  In addition, these Defendants assisted in the transfer of these assets, despite knowing that Bobulinski's consent was required for the transfer of assets out of CBG pursuant to the Pledge Agreement.

141.   These Defendants knew that the transfers were fraudulent given their knowledge of CBG's assets, Bobulinski's creditor rights and the requirement in the Pledge Agreement that Bobulinski consent to any transfer of assets out of CBG.

142.   Bobulinski has been harmed in an amount of tens of millions of dollars (and, including lost profits, in excess of $100 million).

143.   In addition, Bobulinski is informed and believes that the acts of these Defendants alleged herein were done intentionally, maliciously, despicably, oppressively and with the deliberate intent of defrauding Bobulinski for the express purpose of benefiting these Defendants such that Bobulinski are entitled to recover exemplary and punitive damages against these Defendants.

## **FIFTH CAUSE OF ACTION**

### **(Violations of Cal. Civ. Code § 3439
against Hugh Dickson and Grant Thornton Specialist Services Ltd.)**

144.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

145.   A transfer of assets made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer, if the debtor made the transfer (1) with an actual intent to hinder, delay, or defraud any creditor, or (2) without receiving reasonably equivalent value in return, and either (a) was engaged in or about to engage in a business or transaction for which the debtor's assets were unreasonably small, or (b) intended to, or reasonably believed, or reasonably should have believed, that he or she would incur debts beyond his or her ability to pay as they became due a creditor who makes a successful fraudulent conveyance claim may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim."

146.   Hugh Dickson violated California Civil Code section 3439 in effectuating the transfer of pledged assets out of CBG to RAAD before the sale to Remark.  Dickson was at the time of the transfers one of the Joint Official Liquidators of CBG and employed by Grant Thornton.

147.   As a result of Dickson and Grant Thornton's actions, Bobulinski has been harmed in an amount to be proven at trial.

148.   In addition, Bobulinski is informed and believes that the acts of these Defendants alleged herein were done intentionally, maliciously, despicably, oppressively and with the deliberate intent of defrauding Bobulinski for the express purpose of benefiting these Defendants such that Bobulinski are entitled to recover exemplary and punitive damages against these Defendants.

## SIXTH CAUSE OF ACTION

**(Aiding and Abetting Violations of Cal. Civ. Code § 3439 against Robert Roche, Hickory Grove, Theresa Roche, Jake Fisch, Sheppard Mullin, Don Williams, Phillip Tyrrell, Walkers and MGG**)

149.   Bobulinski repeats and re-alleges each preceding paragraph as if set forth in full herein.

150.   Plaintiff is informed and believe that Robert Roche, Hickory Grove, Theresa Roche, Jake Fisch, Sheppard Mullin, Don Williams, Phillip Tyrrell, Walkers and MGG aided and abetted the JOLs and Grant Thornton with the transfer of assets out of CBG in violation of California Civil Code section 3439.  Among other things, these Defendants orchestrated the transfer of assets out of CBG on the eve of the sale to Remark so that CBG would have no assets that would secure Bobulinski's loans to the company.  In addition, these Defendants assisted in the transfer of these assets, despite knowing that Bobulinski's consent was required for the transfer of assets out of CBG pursuant to the Pledge Agreement.

151.   Bobulinski has been harmed in an amount of tens of millions of dollars (and, including lost profits, in excess of $100 million).

152.   In addition, Bobulinski is informed and believes that the acts of these Defendants alleged herein were done intentionally, maliciously, despicably, oppressively and with the deliberate intent of defrauding Bobulinski for the express purpose of benefiting these Defendants such that Bobulinski are entitled to recover exemplary and punitive damages against these Defendants.

1

## PRAYER

2

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

3

1.     For actual and consequential damages to be proven at trial;

4

2.     Compensatory damages, in an amount to be proven at trial, including

5

lost profits;

6

3.     For punitive and exemplary damages;

7

4.     For costs of suit;

8

5.     For attorneys' fees as permitted by law;

9

6.     For pre- and post-judgment interest; and

10

7.     For such other and further relief that this Court deems proper.

11

12

13

DATED:  March 29, 2024          Respectfully submitted,

14

WAYMAKER LLP

15

16

17

By:   /s/ *Jaime W. Marquart*

18

Ryan G. Baker

Jaime W. Marquart

19

Teresa L. Huggins

Sam S. Meehan

20

*Attorneys for Plaintiff Tony Bobulinski*

21

22

23

24

25

26

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff Tony Bobulinski hereby demands a jury trial of all claims, defenses, and requests for relief in this matter for which there is a right to a jury trial.

DATED:  March 29, 2024          WAYMAKER LLP


By:   /s/ *Jaime W. Marquart*
          Ryan G. Baker
          Jaime W. Marquart
          Teresa L. Huggins
          Sam S. Meehan
          *Attorneys for Plaintiff Tony Bobulinski*

COMPLAINT